IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Warminster Township,               :
                    Petitioner     :
                                   :
        v.                         : No.  1258 C.D. 2022
                                   : Argued:  November 6, 2023
Sean Murray (Workers' Compensation :
Appeal Board),                     :
                    Respondent     :


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
          HONORABLE STACY WALLACE, Judge
          HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WALLACE                        FILED:  December 20, 2023


        Warminster Township (Employer) petitions for review of the October 12, 2022 order of the Workers' Compensation Appeal Board (Board), which affirmed in part and reversed in part the June 30, 2021 decision of the Workers' Compensation Judge (WCJ).  The Board reversed the WCJ's award of a credit to Employer for severance benefits Sean Murray (Claimant) received under Section 204(a) of the Workers' Compensation Act (Act)[1] but otherwise affirmed the decision, rejecting Employer's contention that Claimant failed to provide timely notice of his work-

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 71(a).

related injury under Section 311 of the Act.[2]  After careful review, we affirm in part, reverse in part, and remand.

## I. Background

Employer is a township in Bucks County.  Claimant worked as a skilled laborer in Employer's public works department for 13 years.  WCJ Decision (Dec.), 6/30/21, Findings of Fact (F.F.) ¶ 1.  Claimant's work required him to perform "heavy duty," physically demanding tasks, such as filling potholes, paving roads, and reconditioning storm drains.  *Id.* ¶¶ 6a, 14.  Claimant went on paid leave in March 2019 due to an ongoing injury to his right knee.  *Id.* ¶¶ 1, 6j, 8a-b.  Claimant never returned to work and ultimately signed a separation agreement on December 6, 2019, resigning his position and releasing Employer from liability for various legal claims in exchange for one year's salary.  *Id.* ¶ 6n; Ex. D-01, Separation Agreement.  Claimant did not allege his knee injury was related to his work for Employer before resigning.  WCJ Dec., 6/30/21, F.F. ¶ 6n.

On January 30, 2020, Claimant filed a claim petition, alleging for the first time that his knee injury was work related.  Employer filed a notice of workers' compensation denial on February 6, 2020, followed by an answer on February 9, 2020, disputing responsibility for Claimant's injury.  The matter proceeded before a WCJ.  Claimant testified on his own behalf and presented the deposition of Kevin Anbari, M.D. (Dr. Anbari), who opined Claimant's work activities significantly aggravated the osteoarthritis in his knee.  Employer presented testimony from Public Works Director Eric Hinz and Budget and Human Resources Manager Katherine McGovern.  Employer also presented the depositions of Arnold Berman, M.D., and

---

[2] 77 P.S. § 631.

2

Stuart Gordon, M.D., who opined, contrary to Dr. Anbari, that Claimant's knee injury was not work related.

Importantly, Claimant's testimony described his history of knee problems and how he discovered those problems were related to his job. Claimant testified he did not have any significant knee problems before he began working for Employer in August 2006. Notes of Testimony (N.T.), 6/30/20, at 7. Claimant acknowledged his primary care doctor x-rayed both his knees in 2008, but he did not recall why. *Id.* at 8. He had "some minor aches and pains" in his right knee associated with work activities, such as squatting, kneeling, or going up and down steps, but he attributed this to "getting older." *Id.* at 24-25.

In March 2017, Claimant "twisted" his right knee playing ice hockey. N.T., 6/30/20, at 8, 26. Claimant testified he continued working after this incident and initially had no difficulty performing his job, although he noted "some sharp pains." *Id.* at 26. Claimant's condition worsened over time, and he sought treatment from his primary care doctor. *Id.* at 27-28. Claimant later sought treatment from an orthopedic specialist as well, because he was suffering "a lot of sharp pains," and his knee "swelled up really bad, and it got stiff." *Id.* According to Claimant, he "knew something . . . might have been wrong" with his knee because it sometimes felt unstable and "would give out" at work, followed by "really bad" pain. *Id.* at 28-29. Claimant underwent a meniscus surgery in October 2017.[3] *Id.* at 30.

Claimant returned to work for Employer in December 2017. N.T., 6/30/20, at 30. Claimant testified his knee did not feel better after surgery, and "once [he] went back to work it actually felt worse." *Id.* By the summer of 2018, Claimant

---

[3] Claimant testified he played ice hockey only "a few times" after his surgery, and "it was painful." N.T., 6/30/20, at 35. He stopped playing ice hockey completely by the summer of 2018. *Id.* at 34, 84.

explained, his knee "was just not right. It was swollen. It was unstable. And it hurt a lot." *Id.* at 32. Claimant sought treatment from a different orthopedic specialist. *Id.* He went on paid leave and, on March 6, 2019, underwent a partial knee replacement. *Id.* at 36-37, 88-89. Claimant believed his knee improved after surgery, although he still felt pain. *Id.* at 38-39. Claimant fell at his home in May 2019. *Id.* at 39. The fall caused Claimant "a lot of pain, but then it subsided and leveled off." *Id.*

By October 2019, Claimant was running out of paid leave, and he attempted to return to work for Employer a second time. N.T., 6/30/20, at 41-43, 90-93. Claimant testified Employer sent him for a medical examination, which cleared him to perform "lighter[-]duty" work. *Id.* at 44. Employer did not have lighter-duty work available, so Claimant asked if he could return in a different capacity, such as working with "the building maintenance guys or even with the park and rec department." *Id.* Employer refused. *Id.* Claimant went to his own doctor, who cleared him to return to work limited by his pain tolerance. *Id.* at 45-47, 55, 92-93, 122-23. This caused a "stalemate," Claimant explained, "where one doctor said [he could] go back to work and the other one said [he] couldn't." *Id.* at 47. Employer offered Claimant the opportunity to see a third doctor, but it would be another doctor of Employer's choosing. *Id.*

Claimant's union negotiated a separation agreement with Employer on his behalf, which he signed on December 6, 2019. N.T., 6/30/20, at 62-63; Ex. D-01, Separation Agreement. Under the terms of the agreement, Claimant resigned his employment and released Employer from liability for various legal claims. Ex. D-01, Separation Agreement ¶¶ 1(a), 3(a)-(b). He received "a severance benefit" of one year's salary in exchange, totaling $48,422.40, "subject to all required

4

withholdings and deductions, with the exception of any deductions for pension and health insurance." *Id.* ¶ 1(a)-(b). Claimant's net payment from the separation agreement was $27,153.71. N.T., 6/30/20, at 66.

Claimant testified he initially "wasn't sure" what caused his knee injury but suspected it might have resulted from playing ice hockey or "wear and tear." N.T., 6/30/20, at 57. Claimant's attorney recommended that he seek an opinion regarding causation from Dr. Anbari, who evaluated Claimant in late December 2019. *Id.* at 58-60, 104-09. Claimant explained the first opinion he received regarding causation was Dr. Anbari's report, time-stamped January 16, 2020. *Id.* at 58-59. Claimant informed Employer of Dr. Anbari's opinion on February 13, 2020. *Id.* at 60. Meanwhile, Claimant's knee did not improve, and he underwent a full knee replacement on February 28, 2020. *Id.* at 61.

The WCJ issued a decision on June 30, 2021, granting the claim petition and concluding the work Claimant performed for Employer "materially aggravated his arthritic right knee condition on a daily basis, causing the need for the partial and total knee replacements and resulting in total disability." WCJ Dec., 6/30/21, Conclusions of Law ¶ 2. The WCJ found Claimant credible, specifically accepting his explanation that he was not aware his injury was work related until Dr. Anbari evaluated him. WCJ Dec., 6/30/21, F.F. ¶¶ 14, 17. The WCJ determined Claimant was entitled to workers' compensation benefits as of March 4, 2019.[4] *Id.* ¶ 18. Nonetheless, the WCJ acknowledged Employer entered into a separation agreement with Claimant, providing for severance benefits. *Id.* ¶ 19. The WCJ

---

[4] Claimant initially testified his last day of work was March 3, 2019. N.T., 6/30/20, at 37. On rebuttal, he testified his last day was March 5, 2019. N.T., 2/3/21, at 73. The WCJ found Claimant left work "after March 3, 2019," and, as explained above, awarded workers' compensation as of March 4, 2019. WCJ Dec., 6/30/21, F.F. ¶¶ 1, 18. Employer does not question this discrepancy on appeal.

5

awarded Employer a credit for $48,422.40, the gross amount of benefits Claimant was entitled to receive.[5]  *Id.*

Both Claimant and Employer appealed to the Board.  Pertinently, Claimant challenged the WCJ's decision to award Employer a credit for severance benefits, while Employer argued Claimant failed to provide timely notice of his knee injury. Bd. Op., 10/12/22, at 2.  On October 12, 2022, the Board issued an order affirming in part and reversing in part.  Regarding the WCJ's award of a credit for severance benefits, the Board reversed.  The Board agreed with Claimant that the money he received from Employer was not a severance benefit "because it was the result of a bargained[-]for agreement."  *Id.* at 24.  The Board reasoned that, although the money Claimant received was described in his separation agreement as a severance benefit, "the parties entered into an agreement whereby Claimant would resign and release any claim for any cause of action against [Employer].  As such, the payment was in consideration and release of any other claims against [Employer] and not subject to a credit."  *Id.*  The Board affirmed the remainder of the WCJ's decision, concluding Claimant timely notified Employer of his work-related injury.  *Id.* at 21-23.  The Board cited the WCJ's credibility determinations in Claimant's favor and Claimant's explanation that he did not realize his knee injury was work related until receiving Dr. Anbari's report.  *Id.* at 21-22.

Employer filed a petition for review in this Court.  Employer challenges the Board's conclusion that it was not entitled to a credit for severance benefits Claimant received under his separation agreement.  Employer's Br. at 5, 16-25.  Further, Employer contends Claimant failed to provide timely notice that his knee injury was work related.  *Id.* at 6, 25-28.

---

[5] In his June 30, 2021 decision, the WCJ mistakenly awarded Employer a credit of $49,422.40. The WCJ issued an amended order on July 14, 2021, correcting the amount to $48,422.40.

## II. Discussion

We review workers' compensation orders for violations of the petitioner's constitutional rights, violations of agency practice and procedure, and other errors of law. 2 Pa.C.S. § 704. In addition, we review whether substantial evidence supports the findings of fact necessary to sustain the decision. *Id.* The WCJ is the fact-finder in workers' compensation cases and is entitled to weigh the evidence and assess the credibility of witnesses. *Montano v. Advance Stores Co., Inc. (Workers' Comp. Appeal Bd.)*, 278 A.3d 969, 978 n.4 (Pa. Cmwlth. 2022) (citing *Sharkey v. Workers' Comp. Appeal Bd. (Fed. Express)*, 786 A.2d 1035, 1038 (Pa. Cmwlth. 2001)). We must view the evidence in the light most favorable to the party that prevailed before the WCJ, drawing all reasonable inferences in support of the WCJ's decision. *Id.*

In its first, second, and third issues combined, Employer challenges the Board's conclusion that it was not entitled to a credit for the severance benefits Claimant received under his separation agreement. Employer's Br. at 5, 16-25. Employer relies on Section 204(a) of the Act, which provides, in relevant part, that "severance benefits paid by the employer directly liable for the payment of compensation . . . shall also be credited against the amount" of the workers' compensation award. 77 P.S. § 71(a). Employer directs our attention to the Bureau of Workers' Compensation regulations, which provide the following definition of "severance benefit":

> A benefit which is taxable to the employe and paid as a result of the employe's separation from employment by the employer liable for the payment of workers' compensation, including benefits in the form of tangible property. The term does not include payments received by the employee based on unused vacation or sick leave or otherwise earned income.

7

34 Pa. Code § 123.2.

Employer argues the payments Claimant received were "severance benefits" as defined in the regulations because they were taxable to Claimant and made as a result of his separation from employment. Employer's Br. at 17-18. Employer disputes the Board's conclusion to the contrary, arguing it did not "even try to explain why the severance benefit cannot be both a severance benefit and the consideration for a release of claims." *Id.* at 19, 23-25. In the alternative, Employer argues the Board impaired its contract rights under the state and federal constitutions. *Id.* at 19-23.

We agree with Employer that it should have received a credit for payments made to Claimant under the separation agreement, which fell squarely within the definition of "severance benefit" under 34 Pa. Code § 123.2. Our courts have applied Section 204(a) to severance benefits received as a result of negotiated agreements. *See Kramer v. Workers' Comp. Appeal Bd. (Rite Aid Corp.)*, 883 A.2d 518 (Pa. 2005); *Polis v. Workers' Comp. Appeal Bd. (Verizon Pa., Inc.)*, 988 A.2d 807 (Pa. Cmwlth. 2010). Neither the Board nor Claimant cites authority supporting the contrary position that Section 204(a) applies only when severance benefits were not part of a bargained-for exchange.

We conclude, nonetheless, that the WCJ erred by awarding Employer a credit based on the gross amount of severance benefits Claimant was entitled to receive. Claimant's separation agreement provided he would receive one year's salary, totaling $48,422.40, "subject to all required withholdings and deductions, with the exception of any deductions for pension and health insurance." Ex. D-01, Separation Agreement ¶ 1(b). Claimant testified he received a net payment of $27,153.71. N.T., 6/30/20, at 66. The regulations provide for an "offset" of workers'

8

compensation based on the "net amount" of severance benefits an employee receives:[6]

> (a) Workers' compensation benefits otherwise payable shall be offset by amounts an employee receives in severance benefits subsequent to the work-related injury. The offset may not apply to severance benefits to which an employee may be entitled, but is not receiving.
>
> (b) The net amount of any severance benefits shall offset workers' compensation benefits on a weekly basis except as provided in subsections (c) and (d).
>
> (c) When the employee receives severance benefits in a lump-sum payment, the net amount received by the employee shall be divided by the weekly workers' compensation rate. The result is the number of weeks, and fraction thereof, the insurer may offset against future payments of workers' compensation benefits.
>
> (d) When an employee receives a severance benefit in the form of tangible property, the market value of the property, as determined for Federal tax purposes, shall be divided by the weekly workers' compensation rate. The result is the number of weeks, and fraction thereof, the insurer may offset against future payments of workers' compensation benefits.

34 Pa. Code § 123.11; *see Phila. Gas Works v. Workers' Comp. Appeal Bd. (Amodei)*, 964 A.2d 963, 966 n.8 (Pa. Cmwlth. 2009) (*en banc*).

Employer argues it was proper to award a credit based on the gross amount of severance benefits because Claimant could later seek reimbursement under 34 Pa. Code § 123.4(f).[7] Employer's Reply Br. at 3-4 (citing *Harrison v. Workers' Comp.*

---

[6] The regulations define "net," in relevant part, as the amount of severance benefits "received by the employe after required deductions for local, State and Federal taxes and amounts deducted under the Federal Insurance Contributions Act (FICA) (26 U.S.C.A. §§ 3101--3126)." 34 Pa. Code § 123.2.

[7] That section provides:
**(Footnote continued on next page…)**

*Appeal Bd. (Commonwealth of Pa.)*, 165 A.3d 1019 (Pa. Cmwlth. 2017) (*en banc*)).

Under these circumstances, the possibility of reimbursement cannot overcome the express requirements of 34 Pa. Code § 123.11, which direct that the credit be based on net severance benefits. We therefore reverse and remand for calculation of the correct credit.[8]

In its fourth and final issue, Employer contends Claimant should not have received workers' compensation benefits retroactive to March 4, 2019, because he did not timely notify Employer that he believed his knee injury was work related. Employer's Br. at 6, 25-28. Employer relies on Section 311 of the Act, which provides:

> When Federal, State or local taxes are paid with respect to amounts an employee receives in . . . severance . . . benefits, the insurer shall repay the employee for amounts previously offset, and paid in taxes, from workers' compensation benefits, when the offset was calculated on the pretax amount of the benefit received. To request repayment for amounts previously offset and paid in taxes, the employee shall notify the insurer in writing of the amounts paid in taxes previously included in the offset.

34 Pa. Code § 123.4(f).

---

[8] Employer argues the issue of applying an offset based on net, rather than gross, severance benefits is moot because this Court denied its application for supersedeas. Employer's Reply Br. at 1, 4. Employer requested supersedeas from the Board, which the Board denied on December 7, 2022. It then requested supersedes from this Court, which the Court denied on February 22, 2023. As a result, Employer maintains, "the full $48,422.40 has now been paid over to [Claimant,] and the sole remaining question is whether [Employer] will be entitled to reimbursement of . . . $48,422.40 from the Commonwealth of Pennsylvania Supersedeas Fund." *Id.* The Supersedeas Fund provides for reimbursement of workers' compensation if supersedeas was requested and denied, workers' compensation benefits were paid due to the denial, and "upon the final outcome of the proceedings, it is determined that such compensation was not, in fact, payable." Section 443(a) of the Act, added by Section 3 of the Act of February 8, 1972, P.L. 25, 77 P.S. § 999(a). Because determining whether Employer is entitled to a credit for gross or net severance benefits establishes the workers' compensation that "was not, in fact, payable," we cannot conclude the issue is moot. *See id.*

10

Unless the employer shall have knowledge of the occurrence of the injury, or unless the employe or someone in his behalf, or some of the dependents or someone in their behalf, shall give notice thereof to the employer within twenty-one days after the injury, no compensation shall be due until such notice be given, and, unless such notice be given within one hundred and twenty days after the occurrence of the injury, no compensation shall be allowed. However, in cases of injury resulting from ionizing radiation or any other cause in which the nature of the injury or its relationship to the employment is not known to the employe, the time for giving notice shall not begin to run until the employe knows, or by the exercise of reasonable diligence should know, of the existence of the injury and its possible relationship to his employment. The term "injury" in this section means, in cases of occupational disease, disability resulting from occupational disease.

77 P.S. § 631.

Section 311 requires that an employee provide notice within 21 days of the date he or she knows, or should know, that an injury occurred and was work related. *City of Pittsburgh v. Workers' Comp. Appeal Bd. (Flaherty)*, 187 A.3d 1061, 1066 (Pa. Cmwlth. 2018) (citing *Martincic v. Workmen's Comp. Appeal Bd. (Greater Pittsburgh Int'l Airport)*, 529 A.2d 600, 602 (Pa. Cmwlth. 1987)). If the employee gives notice after 21 days but within 120 days, compensation will be payable from the date notice was given. *Id.* at 1066-67. When an employee alleges the existence of a "cumulative trauma injury" caused by working conditions, Section 311's time limitations "begin[] to run on the last day of aggravation, which will normally be the last day of work." *Allegheny Ludlum Corp. v. Workers' Comp. Appeal Bd. (Holmes)*, 998 A.2d 1030, 1034 (Pa. Cmwlth. 2010) (citing *City of Phila. v. Workers' Comp. Appeal Bd. (Williams)*, 851 A.2d 838, 847-48 (Pa. 2004)).

Employer cites Claimant's testimony that he learned his knee injury was work related on January 16, 2020, from Dr. Anbari's report. Employer's Br. at 26. Employer contends Claimant did not provide notice until February 13, 2020, more than 21 days after January 16, 2020. *Id.* at 26-27. In Employer's view, no workers'

11

compensation benefits were payable until Claimant provided notice, and the WCJ's decision "should be molded to provide that payment of compensation commences as of February 13, 2020, not March 4, 2019."[9] *Id.* at 28.

The error in Employer's reasoning is that Claimant filed his claim petition on January 30, 2020, within 21 days of January 16, 2020. Indeed, Employer filed a notice of compensation denial on February 6, 2020, denying Claimant suffered a work-related injury and acknowledging it received notice on February 3, 2020, also within 21 days. Reading Claimant's testimony in context, February 13, 2020, appears to be the day he informed Employer of Dr. Anbari's opinion, or provided Employer with Dr. Anbari's report, not the day Employer first received notice. *See* N.T., 6/30/20, at 60. Thus, the record belies Employer's contention that Claimant failed to provide timely notice under Section 311.

### III. Conclusion

Accordingly, we affirm the Board's October 12, 2022 order in part and reverse in part. We reverse to the extent the Board concluded Employer was not entitled to a credit for net severance benefits Claimant received under his separation agreement, and we remand to the Board with instructions to further remand to the WCJ for calculation of the correct credit, consistent with 34 Pa. Code § 123.11.

_____
STACY WALLACE, Judge

---

[9] Employer also cites the WCJ's factual finding that Claimant learned his knee injury was work related "[a]s a result of" the examination by Dr. Anbari in December 2019. Employer's Br. at 27 (citing WCJ Dec., 6/30/21, F.F. ¶ 6(o)). The WCJ credited Claimant's testimony and, as Employer concedes, Claimant testified the first opinion he received on causation was Dr. Anbari's report. Viewing the evidence in the light most favorable to Claimant, as we must, we do not interpret the WCJ's finding to mean Claimant first learned his knee injury was work related in December 2019, rather than January 2020. *See Montano*, 278 A.3d at 978 n.4.

12

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Warminster Township, : 
                Petitioner : 
                         : 
      v. : No. 1258 C.D. 2022
                         : 
Sean Murray (Workers' Compensation : 
Appeal Board), : 
              Respondent : 

# **O R D E R**

**AND NOW**, this 20th day of December 2023, the October 12, 2022 order of the Workers' Compensation Appeal Board (Board) is **AFFIRMED** in part and **REVERSED** in part. The order is reversed to the extent the Board concluded Warminster Township (Employer) was not entitled to a credit for the net severance benefits Sean Murray received as part of his separation agreement with Employer. The matter is **REMANDED** to the Board with instructions to further remand to the Workers' Compensation Judge for calculation of the correct credit, consistent with 34 Pa. Code § 123.11.

Jurisdiction relinquished.

_____
STACY WALLACE, Judge